**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CANDICE GLASS, Parent and next friend     :
Of A.G., a minor and A.G. individually,     :
                              :
      Plaintiffs,               :      Civil Action No.:     19-2148 (RC)
                              :
      v.                    :      Re Document Nos.:    11, 13
                              :
DISTRICT OF COLUMBIA,         :
                              :
      Defendant.             :

<u>**MEMORANDUM OPINION**</u>

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiffs A.G., a former student in the District of Columbia, and her mother, Candice

Glass, filed this action against the District of Columbia ("the District") challenging a final

administrative decision that rejected their claim that A.G. had been denied a free and appropriate

public education pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–

1482.  Before the Court are the parties' cross-motions for summary judgment.  The Court agrees

that A.G. was denied a free and appropriate public education during her first two weeks at

Wheatley Education Campus when she was not provided either a new individualized education

plan or comparable services to her out-of-state individualized education plan.  However, the

Court rejects A.G. and Ms. Glass's other claim because A.G.'s individualized education plan's

disability classification was reasonable based on the evidence in the record.  Accordingly, both

A.G. and Ms. Glass's motion for summary judgment and the District's motion for summary

judgment are granted in part and denied in part, and the Court remands this case to the hearing officer for further proceedings consistent with this opinion.

## II.  BACKGROUND

### A.  The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA") is designed to "ensure that every child has a meaningful opportunity to benefit from public education."  *Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015).  To accomplish this goal, the statute provides that every child with a disability in the country is entitled to a free appropriate public education ("FAPE"), that must be tailored to "emphasize[ ] special education and related services designed to meet [the student's] unique needs."  20 U.S.C. § 1400(d)(1)(A).

An individualized educational program ("IEP") is the "primary vehicle" for implementing the FAPE entitlement under the IDEA.  *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C. Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  An IEP, developed in collaboration between the school district, the student's teacher, and the student's guardians, "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *Id.* (quoting *Honig*, 484 U.S. at 311).  If a parent or guardian believes that the IEP as drafted does not provide their child with a FAPE, they have the "right to seek review of any decisions they think inappropriate."  *District of Columbia v. Doe*, 611 F.3d 888, 890 (D.C. Cir. 2010) (quotations omitted).  Procedurally, the parent or guardian must first file an administrative complaint detailing the alleged FAPE denial and then the school district must hold an impartial due process hearing conducted by a hearing officer.  20 U.S.C. § 1415(f).  Administrative

decisions by a hearing officer can in turn be appealed by any aggrieved party—as A.G. and her

mother have done here— through judicial proceedings in a U.S. District Court. *See id.* §

1415(i)(2)(A).

### B. Factual Background

A.G. is a ten-year-old student, who during the time at issue in this action, was a resident

of the District of Columbia and attended fourth grade at Wheatley Education Campus

("Wheatley EC") during the 2018–2019 school year.[1]  Administrative Record ("A.R.") 34, ECF

Nos. 7–10.  A.G. first began seeing mental health professionals when she was five years old, and

over the years received a number of medical diagnoses, including ADHD, Combined Type; R/O

Disruptive Behavior Disorder, NOS; Borderline Intellectual Functioning; Oppositional Defiant

Disorder, Parent-Child Relational Problem; and Autistic Spectrum Disorder ("ASD"), high

functioning, by history.  A.R. 7, 9, 40.   As a result, A.G. has been eligible for services under the

IDEA for much of her educational career.  Due both to A.G.'s numerous educational disabilities

as well as the fact A.G. attended seven different elementary schools between 2013 and 2019,[2]

---

[1] A.G. and her mother, Ms. Glass note that "[s]ubsequent to the filing of [their] complaint, Ms. Glass relocated to Maryland." Pl.'s Mot. for Summ. J. ("Pl.'s MSJ") at 4 n. 1, ECF No. 11.  The Court presumes that this also indicates that A.G. no longer resides in the District.  As a result, they are no longer pursuing some of the avenues of relief requested in their complaint, namely further evaluation of A.G. or a revision of her IEP, and "seek only compensatory education" at this time. *Id.*

[2] A.G. attended six different elementary schools from kindergarten to fourth grade due to frequent family moves back and forth between Prince George's County, Maryland and the District along with school transfers required for her to access different special education programs.  A.R. 34.  A.G. attended Wheatley Education Campus (DCPS) from 2018–2019, Princeton Elementary (Prince George's County, Maryland) from 2017–2018, Friendship PCS Blow Pierce Elementary School (DCPS) from 2017–2018, North Forestville Elementary School (Prince George's County, Maryland) from 2016–2017, Dodge Park Elementary (Prince George's County, Maryland) from 2014–2016, William Paca Elementary School (Prince George's County, Maryland) for portions of the 2013–2014 and 2014–2015 school years, and Glass Manor Elementary School (Prince George's County, Maryland) from 2014–2014.  A.R. 34.

she has a long and at times convoluted educational record, filled with a wide array of teacher

evaluations, formal testing, and the six different IEPs she had received as of the time the

complaint was filed.  A.R. 9–10.

### 1.  A.G.'s History of Psychological Assessments and IEPs

A.G. had her first (of many) psychological evaluations conducted on July 26, 2013, when

she was five years old.  A.R. 38.  The medical professional she met with diagnosed her with

ADHD-Combined Type and a Disruptive Behavior Disorder, as well as cognitive functioning

that was in the Below Average/Borderline Range.  A.R. 40.  While Ms. Glass reported speech

delays, the psychologist found that A.G.'s language development was typical for her age, that

she could maintain eye contact, and ultimately there was nothing "which would suggest

pervasive delays in development." A.R. 12, 48.

The following November, a social worker diagnosed A.G. with Oppositional Defiant

Disorder, ADHD, Parent-Child Relational Problem, Discord with primary supports, educational

problems, and ASD (by history).  A.R. 12, 49.  No standardized assessments were administered

at this screening and the diagnoses were made based on Ms. Glass's parent report.  A.R. 12.  Ms.

Glass stated that A.G. "becomes violent quite frequently" and the evaluator described A.G.'s

behavior at the intake as "out of control" as she yelled at, hit, and attempted to bite her mother.

A.R. 12, 49.  During the consultation, Ms. Glass also reported that A.G. had been diagnosed with

ASD in February 2013 at a medical center in D.C., and because Ms. Glass did not agree with the

diagnosis at that time, she "sought two additional opinions and the diagnosis remained

unchanged."  A.R. 49.  Ms. Glass, however, did not at the time and has not to date produced any

documentary records to verify that these three appointments regarding A.G.'s ASD diagnosis

occurred.  A.R. 21; *see also* Testimony of Candice Glass ("Glass Tr.") at A.R. 1364.

A.G. was again evaluated by mental health professionals in December of 2013, following an interaction at her school in which she told a staff member she wanted to kill herself. A.R. 12. The medical doctor who evaluated A.G. at this time stated that despite the previous diagnosis of ASD, she did not agree with the diagnosis and suggested that A.G. was instead experiencing temper tantrums. A.R. 49.

In April of 2014, A.G. had another comprehensive psychological evaluation administered by the Prince George's County ("PG County") school system, where she was enrolled in kindergarten at Glass Manor Elementary. A.R. 47, 59. The evaluation was ordered due to concerns about A.G.'s behavior in school. A.R. 47, 59. While the teaching staff reported that A.G. did not appear to have any communication difficulties, she was repeatedly disciplined for behaviors such as "threatening to kill other students, biting and scratching the teacher, and throwing objects." A.R. 59. Among a battery of other cognitive and psychological tests, the evaluation included an Autism Spectrum Rating Scale ("ASRS") assessment which "consists of questions about behaviors which students who have Autism may demonstrate." A.R. 58. The ASRS was completed by Ms. Glass and A.G.'s teacher. A.R. 58. The responses from Ms. Glass generated a "slightly elevated" ASD classification, while A.G.'s teacher found a "very elevated" ASD score based on A.G.'s classroom behaviors. A.R. 58. However, the report ultimately concluded that despite A.G.'s demonstration of "some characteristics that can be typical of students with Autism"—including very elevated sensory sensitivity, unusual behaviors, attention/self-regulation, and stereotypy scores on the ASRS—she also "demonstrated many skills atypical of students with Autism." A.R. 60. The report made special note of the fact that while "[s]tudents with Autism typically have difficulty with imaginative play," Ms. Glass had reported that A.G. played make-believe with dolls, and the examiner also observed similar

imaginative play during the evaluation. A.R. 60. The report hypothesized that A.G.'s "many oppositional and noncompliant behaviors . . ." "may have resulted in some elevated scores on the ASRS rating scale." A.R. 60. As a result, at that time A.G. was found not to meet the requirements necessary to be classified as a student with Autism and receive related services in PG County. A.R. 60.

A.G. received her first IEP on December 8, 2014 after she transferred to William Paca Elementary, another school in PG County, where she was enrolled in first grade. A.R. 72–79. The IEP classified her as having ASD. A.R. 73. This classification was premised on the same ASRS "initial evaluation" conducted while A.G. was a kindergartener at Glass Manor Elementary (that had at the time declined to apply an ASD diagnosis), coupled with A.G.'s new IEP team's determination that she "exhibit[ed] many of the characteristics. . . which are consistent with a classification of Autism Spectrum Disorder." A.R. 75. A Prior Written Notice document issued the day after the IEP was finalized noted that while A.G.'s IEP team agreed that she was eligible for special education services based on their preliminary ASD determination, they recommended an observation by an ASD specialist to help determine if a specialized ASD placement away from the general education setting was necessary. A.R. 99.

A.G.'s ASD classification did not last long. Her IEP was revised just four months later on March 16, 2015, changing her classification from ASD to Emotional Disturbance ("ED"). A.R. 138. A.G.'s IEP team noted that "[u]pon review of [A.G.'s] assessments, recent observations by Autism specialist, Administration, Psychologist, Special Education teacher, general education teacher and parent showed that [A.G.] exhibited pervasive behaviors for a long period of time consistent with a student with Emotional Disability." A.R. 139.

A.G.'s IEP was not updated again for almost two years.  A.R. 166.  But on March 6, 2017, A.G.'s IEP team determined she now needed a "full time special education program within a small structured classroom" along with individual and small group counseling to "address her social/emotional/behavior needs."  A.R. 166, 187.  She was also provided a Behavior Intervention Plan and accommodations such as visual and graphic organizers, preferential seating, and repetition of instructions. A.R. 175–79.  Her classification of ED remained unchanged.  A.R. 166.

Due to a family move, A.G. began the 2017–2018 school year as a third grader at Friendship PCS Blow Pierce Elementary ("Friendship PCS") in the District.  A.R. 34.  Her IEP was updated again on September 29, 2017 ("2017 DCPS IEP").  A.R. 233.  Her 2017 DCPS IEP continued to classify her as ED, and provided twenty-two and a half hours per week of specialized instruction, and two hours per week of Behavioral Support Services ("BSS") for A.G.—meaning she remained in a self-contained special education program.  A.R. 240, 265. The report noted that A.G.'s relationships with both the teaching staff and peers were "volatile," with her frequently acting "defiant, aggressive, and non-compliant," and that her outbursts were often in reaction to the behavior of teachers or peers.  A.R. 238.  A.G.'s mother participated in the eligibility meeting held the day before the IEP was finalized, and at the time indicated her agreement with the classification and education plan.  A.R. 233.

Three months into A.G.'s third grade year she transferred from Friendship PCS to Princeton Elementary School ("Princeton ES") in PG County.  A.R. 265.  A.G.'s new special education team determined "there was a need to collect new assessment data in order to make a proper determination" of A.G.'s learning needs, which was completed between January and March of 2018.  A.R. 265.  The administered testing included the Woodcock Johnson IV Test of

Achievement ("WJ-IV"), the Adaptive Behavior Assessment Scale – Third Edition ("ABAS-III"), the Connors' Comprehensive Behavior Rating Scales Parent and Teacher Form ("CBRS"), and the Wechsler Intelligence for Children Fifth Edition (WISC-V).  A.R. 269.  Select results, such as the WISC-V, rated A.G.'s general intellectual ability as "Below Expected" and "in the Very Low range when compared to other children her age."  A.R. 271.  A.G. also tested in the "clinically significant" ranges on the CBRS evaluation for the following: Conduct Disorder, Oppositional Defiant Disorder, Separation Anxiety Disorder, and ASD.  A.R. 276–77.  These results, taken together with behavioral reports from Ms. Glass and A.G.'s teachers, caused the school psychologist to recommend that A.G.'s IEP team "consider [A.G.'s] eligibility for special education services as a student with [ASD]."  A.R. 279.

A.G.'s IEP team at Princeton ES took this advice, issuing A.G. a revised IEP on April 10, 2018 ("2018 Maryland IEP") which changed her disability classification from ED to ASD.  A.R. 283–84.  The IEP provided for four hours per week of specialized instruction outside a general education classroom, six hours per week of specialized instruction inside a general education classroom, but no counseling or behavioral support services.  A.R. 307.  She was also allotted additional classroom modifications and supports such as noise canceling headphones, a separate location to complete assignments, the use of manipulatives, checks for understanding, confirmation of directions and classroom routines, the ability to draw responses to augment her written responses to classroom assignments, modified assignments, positive reinforcement following the completion of tasks, and social skills training.  A.R. 293–300.

### 2. The 2018 District of Columbia Public School ("DCPS") IEP

A.G. began the 2018-2019 school year—entering fourth grade at her neighborhood DCPS school, Wheatley EC—fifteen days into the school year after her family moved back to the

District from Maryland.  A.R. 7, 34, 477.  She began attending class on September 10, 2018.

A.R. 7, 34; *see also* Testimony of Miranda Kogon ("Kogon Tr.") at A.R. 1549.  Seventeen days

later, A.G. was issued a new IEP ("2018 DCPS IEP") which changed her disability classification

back to ED from ASD, and increased her specialized instruction, providing for twenty-two and a

half hours per week of specialized instruction outside of her general education classroom and

240 minutes per month of behavioral support services.  A.R. 8, 346, 355.  To meet this

requirement, A.G.'s multidisciplinary team proposed that A.G. transfer to a school that offered a

behavior education support ("BES") placement for students with ED.  *See* Testimony of Michael

Deely ("Deely Tr.") at A.R. 1454; A.R. 356 (noting "[A.G.] requires instruction in a smaller

class setting with fewer students and increased classroom staff support to be able to access

academics and to also support her behavior, so it does not impact her (or her peers) ability to

access the academics.").  This determination was made after a review of parent and teacher

reports and A.G.'s educational records, including her two most recent IEPs that included the

results from the battery of tests conducted in March of 2018— the same evaluations that had

previously been used as the justification for A.G.'s ASD classification in her 2018 Maryland

IEP.  A.R. 349, 353.  Special education professionals from Wheatley EC claim that they, along

with Ms. Glass, "as a team went through each category" for both the ASD classification and the

ED classification, and ultimately they "agreed that [A.G.] fell most likely with her behaviors

under the ED classification."  Testimony of Tina Johnson ("Johnson Tr.") at A.R. 1399–1401;

Testimony of Emily Brainard ("Brainard Tr.") at A.R. 1659, 1669.

     Ms. Glass disputes this recollection of the September 27, 2018 IEP meeting.  She claims

that she was not in agreement with changing A.G.'s classification to ED, and was unhappy with

some of the other changes made to A.G.'s 2018 Maryland IEP in her 2018 DCPS IEP.  Glass Tr.

at A.R. 1345.  She felt that A.G.'s behavior and academics had improved while she was enrolled in the ASD program at Princeton ES, citing a decrease in the number of phone calls from the school, and was concerned that shifting A.G.'s classification back to ED would impede this progress.  A.R. 11; Glass Tr. at A.R. 1344; *see also id.* at A.R. 1339 (noting A.G. "didn't do good at all" in an E.D. placement in 2015–2016, because "she would get punished for stuff that they didn't know how to deal with basically.").

The District posits that Ms. Glass only objected to the BES program after she learned it would require A.G. to transfer to another school.  This conclusion was supported by several of the District's witnesses, all of whom are educational professionals who were in attendance at the September 27, 2018 IEP meeting.  *See* Brainard Tr. at A.R. 1669 (noting Ms. Glass initially agreed with the IEP and signed it, only to "became incredibly angry" when informed A.G. would need a new placement, testifying that "it seemed like mom was very concerned only about [A.G.] changing schools, not necessarily [that she] had problems with the program."); Deely Tr. at A.R. 1454 (describing how "at the end" of the IEP meeting, Ms. Glass "became upset" when she realized Wheatley EC didn't provide an onsite BES program.)

A.G.'s multidisciplinary team convened again on November 16, 2018 to meet with Ms. Glass and her legal advocate and discuss her concerns about A.G.'s new IEP.  A.R. 403–05, 408.  At this second meeting, Ms. Glass was notified that A.G. was not accessing her education at Wheatley EC as she was "not completing assignments, needed one on one support, and was having frequent outbursts through-out the school day."  A.R. 478.  The multidisciplinary team and Ms. Glass ultimately agreed that DCPS would conduct additional evaluations to assess if A.G. had ASD or ED and agreed to reconvene on January 11, 2019 to discuss the results.  A.R.

405, 411.  In the meantime, Ms. Glass and her legal representative filed a due process complaint against the District requesting a resolution meeting on December 21, 2018.  A.R. 469–72.

Pursuant to their agreement with Ms. Glass, DCPS administered the Childhood Autism Rating Scale, Second Edition ("CARS-2") to Ms. Glass and A.G.'s special education teacher the following month.  *See* A.R. 459.  CARS-2 is an "assessment tool used to identify [ASD] in individuals aged two and up" and includes fifteen categories of primary autism symptoms that are rated by the evaluator on their severity based on their observations.  A.R. 537.  This assessment of the CARS-2 concluded that A.G. had minimal to no symptoms of ASD.  A.R. 537–39.  However, Ms. Glass and Mr. Deely, the DCPS school psychologist who administered the test, both agree that this assessment was improperly administered to Ms. Glass because the CARS-2 rating scales should only be completed by experts in ASD, and Ms. Glass was not a proper evaluator due to her lack of experience.[3]  A.R. 14; Deely Tr. at A.R. 1457.

A.G.'s multidisciplinary team reconvened on January 11, 2019 to discuss the test results and update A.G.'s 2018 DCPS IEP as needed.  A.R. 673–83.  Based on the evaluations conducted, the team believed they had enough information to make a disability determination, and were planning to consider the following disability classifications for A.G.: Other Health Impairment, ASD, and ED.  A.R. 678.  However, Ms. Glass and her counsel did not believe there was enough information to proceed.  A.R. 678.  They informed the multidisciplinary team that they would be obtaining outside ASD testing for A.G.  A.R. 678.

---

[3] The District argues that the results of the November 2018 CARS-2 assessment are still valid given that A.G.'s special education teacher—an expert in ASD—also completed the test on A.G.'s behalf and still found A.G. displayed minimal to no symptoms of ASD.  Deely Tr. at A.R. 1457.  A score between 15 and 29.5 indicates minimal to no symptoms of ASD, and Ms. Glass's evaluation of A.G. scored a 20.5, while A.G.'s teacher scored a 21.5.  A.R. 676.

As a result, in early 2019 Ms. Glass hired an independent evaluator to administer a psychological evaluation ("2019 Independent Evaluation"), who diagnosed A.G. with ASD on the basis of his administration of the CARS, along with A.G.'s medical history, the evaluator's observations, and A.G.'s teacher reports.  A.R. 787–800.  Of particular note, this evaluation relied heavily on parental reports of behavior by A.G. that indicated clinically significant symptoms of ASD—including head banging, flipping hands, covering ears and sensitivity to sound, non-response to verbal inquiries, difficulty establishing friendships, rigid routines, and early onset of symptoms at age 2 or 3.  A.R. 793–94.  And while cited as being a supporting factor in his diagnosis, A.G.'s CARS results from this administration were not included in the independent evaluator's report.  A.R. 14–15; Deely Tr. at A.R. 1497.

### 3.  A.G.'s IDEA Administrative Hearing

Having been unable to change A.G.'s 2018 DCPS IEP by working with the District, Ms. Glass exercised her statutory right to demand an "impartial due process hearing," *see* 20 U.S.C. §§ 1415(b)(6), (f)(1), and as mentioned filed an administrative complaint on December 21, 2018. A.R. 469–486.  She claimed, in relevant part, that the 2018 DCPS IEP was inappropriate and constituted a denial of a FAPE both for (a) failing to provide A.G. with comparable services to her most recent IEP from Princeton ES in Maryland, and (b) misclassifying A.G. with ED instead of ASD.  A.R. 480–82.

The IDEA hearing took place over four days in early March of 2019, and both parties were represented by counsel.  A.R. 4.  The hearing officer heard testimony from twelve witnesses: the District presented eight witnesses, primarily educational professionals from Wheatley EC, while A.G. and Ms. Glass presented four witnesses, including a clinical psychologist, two education advocates, and testimony from Ms. Glass herself.  A.R. at 4–5.

The District's expert witness in school psychology, Mr. Michael Deely, who is the school psychologist at Wheatley EC, testified that based on his evaluation of A.G., his review of her educational records, and his observations of her behavior on the playground, he believed A.G. should be classified as ED, not ASD.  Deely Tr. at A.R. 1447, 1453–54; *see also id.* at A.R. 1462 (describing A.G.'s classroom behavior as the "kind of oppositional behavior that's pretty cookie cutter standard" for a student with ED).  He also supported this conclusion based on his observations of A.G.'s behavior that contradict common ASD symptoms, namely her ability to pick up on social cues, her social awareness of both peers and teachers and her ability to communicate with both, her ability to engage in imaginative play, use sarcasm, and that there was no documented regression in her language abilities in her medical record.  *See* Deely Tr. at A.R. 1459–62, 1493–97.  Ms. Emily Brainard, the District's expert in special education programming who also participated in A.G.'s 2018 DCPS IEP drafting process, testified that she agreed with Mr. Deely's conclusion about A.G.'s disability classification.  *See* Brainard Tr. at A.R. 1704.  She explained that A.G. displayed none of the difficulties with social cues that ASD students typically have, as she uses sarcasm often, can explain her feelings, and possesses the social skills to understand comments or looks from her peers and emotionally react.  Brainard Tr. at A.R. 1704–05.  A designated expert in social work for the District, Ms. Nashee McClary, also testified to A.G.'s social skills.  *See* Testimony of Nashee McClary ("McClary Tr.") at A.R. 1512–30.  Ms. McClary was designed an expert in social work and facilitated weekly group counseling with A.G., who she described as "my social butterfly" and as able to "engage[] with her peer group pretty well," McClary Tr. at A.R. 1519–20, with none of the difficulties in communicating or expressing herself that Ms. McClary typically observed in students with ASD.  McClary Tr. at A.R. 1523–24.  Instead, she described A.G.'s behavior—outbursts, defiance, and

saying "no to authority"— as being of the type she more typically observes in ED students. McClary Tr. at A.R. 1523.

In response, Ms. Glass introduced the testimony of Dr. Griffin Doyle, a clinical psychologist and expert in clinical psychology who came to the opposite conclusion.  He argued that A.G.'s auditory sensitivity, difficulties with language comprehension and learning, difficulties establishing friendships, poor eye contact, and rigidity in a school setting indicated that A.G. had ASD.  Testimony of Dr. Griffin Doyle (Doyle Tr.) at A.R. 1202–03.  Another witness for A.G. and Ms. Glass, Dr. Gaines, agreed with Dr. Doyle's assessment.  *See* Testimony of Dr. Wilma Gaines ("Gaines Tr.") at A.R. 1228–29.  During her observation of A.G., she identified A.G.'s language difficulties—such as self-contradictory stories and an inability to answer questions based on a reading passage until it was read aloud to her— as ASD indicators. Gaines Tr. at A.R. 1228–29.  She also noted A.G.'s flat affect, difficulty with eye contact, and attempting to play both players in a two-partner game as other typical ASD behaviors.  Gaines Tr. at A.R. 1228–29.

One point of commonality between both parties' experts was that they agreed that placing A.G. in a program for a disorder she does not have would have a negative effect on both her and her future classmates.  A Communication Education Support Program ("CES") is intended to improve the language skills of ASD students through applied behavior analysis programming, and often includes students with severe communication disabilities, such that some students communicate only through pictures and gestures.  A.R. 20; Gaines Tr. at A.R. 1226; Kogon Tr. at A.R. 1564, 1581.  In contrast, a BES classroom is designed to assist students with ED by providing a more therapeutic environment through small class sizes and extra professional

supports.  A.R. 20; Gaines Tr. at A.R. 1226.  Critically, some students in BES classrooms also have ASD.  A.R. 20.

Mr. Deely testified that placing A.G. in an ASD program would "be pretty disastrous" given that she would be placed with ASD students who can't absorb social cues and don't respond well to disruptions—negatively impacting both A.G.'s education progress and impeding other ASD students' learning given A.G.'s propensity for classroom outbursts.  Deely Tr. at A.R. 1465–66.  Dr. Gaines argued the opposite, claiming that placing A.G. in a BES classroom would "have a very negative impact on . . . her social skills, her behaviors, and her academics" since a BES program lacks the same program structure and communication supports present in a CES classroom that she stated A.G. needs.  Gaines Tr. at A.R. 1230.

The hearing officer issued his administrative findings on April 22, 2019, concluding that the District's seventeen-day delay in implementing services comparable to the 2018 Maryland IEP did not constitute a substantive denial of a FAPE, and that A.G.'s 2018 DCPS IEP classification of ED, not ASD, was proper.  A.R. 23–27.  A.G. and Ms. Glass filed this lawsuit on July 19, 2019, challenging the hearing officer's determination.  *See* Compl., ECF No. 1.  Both parties have since moved for summary judgment.  *See generally* Pl.'s Mot. for Summ. J. ("Pl.'s MSJ"), ECF No. 11, Dist.'s Opp'n & Cross Mot. Summ. J. ("Def.'s MSJ"), ECF No. 13.[4]  Ms. Glass re-asserts that (1) the District denied A.G. a FAPE following her transfer to Wheatley EC by allowing seventeen days to elapse before a new IEP was implemented, during which time no comparable services to the 2018 Maryland IEP were offered; (2) the 2018 DCPS IEP

---

[4] ECF Nos. 13 and 14 are the same document, the District's combined opposition and cross-motion for summary judgment.

inappropriately diagnosed A.G. with ED, when she should have received an ASD classification, and (3) A.G. is entitled to compensatory education for these denials of a FAPE.

## III.   LEGAL STANDARDS

### A.   Summary Judgment in IDEA Administrative Review

"Although motions for review of [a hearing officer's determination] are called motions for summary judgment, the court does not follow "a true summary judgment procedure." *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting *L.R.L. ex rel. Lomax v. District of Columbia,* 896 F. Supp. 2d 69, 73 (D.D.C. 2012)).  Instead, a motion for summary judgment in an IDEA administrative review case "operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive."  *D.R. ex rel. Robinson v. District of Columbia*, 637 F.Supp.2d 11, 16 (D.D.C. 2009). Where, as here, "no new evidence has been submitted . . . the Court will treat the parties' cross-motions for summary judgment as motions for judgment based on the administrative record." *Collette v. District of Columbia*, No. 18-CV-1104, 2019 WL 3502927, at *6 (D.D.C. Aug. 1, 2019) (quoting *G.G. ex rel. Gersten v. District of Columbia*, 924 F. Supp. 69, 73 (D.D.C. 2012)).  This procedure is essentially "a bench trial based on a stipulated record."  *N.W. v. District of Columbia*, 253 F. Supp. 3d 5, 12 (D.D.C. 2017) (quoting *Lomax*, 896 F. Supp.2d at 73).

A court reviewing an administrative IDEA determination "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see also* 34 C.F.R. § 300.516(c).  It is the responsibility of the Court to give "due weight" to the administrative findings, and refrain from

"substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982). However, the D.C. Circuit has held that "less deference than is conventional in administrative proceedings" is the correct standard of review. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (internal quotations omitted). And a hearing decision lacking "reasoned and specific findings deserves little deference." *Kerkam ex rel. Kerkam v. Superintendent, D.C. Pub. Sch*., 931 F.2d 84, 87 (D.C. Cir. 1991) (quotations omitted).

The party challenging the administrative decision—here, A.G. and her mother, Ms. Glass—have the burden of proving deficiencies in the administrative decision by a preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C. Cir. 1988) (describing that the party challenging the hearing officer determination must "at least take on the burden of persuading the court that the hearing officer was wrong.").

When remedying a violation of the IDEA, a district court may "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see also Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985) (discussing the "broad discretion" of the court to craft relief, limited only by the instruction that "relief is to be 'appropriate' in light of the purpose of the Act."). Compensatory education, an award of services "to be provided prospectively to compensate for a past deficient program," *Reid,* 401 F.3d at 522, is a common form of relief awarded. Such an award "involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an education deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *Id.* at 523 (internal quotations omitted).

## IV.  ANALYSIS

Both parties seek summary judgment on A.G. and Ms. Glass's claims that the District denied A.G. a FAPE by (1) allowing seventeen days to elapse following A.G.'s transfer to Wheatley EC before a new IEP was developed, during which time no comparable services to the 2018 Maryland IEP were offered, and (2) improperly changing A.G.'s disability classification from ASD to ED on her 2018 DCPS IEP.  As explained below, while the Court agrees with Ms. Glass's arguments that the District failed to provide A.G. with a FAPE following her transfer to Wheatley EC, during which for over two weeks they did not implement either comparable services to her 2018 Maryland IEP or put into effect a new IEP, the Court does not believe the District's selection of an ED classification on A.G.'s 2018 DCPS IEP was so unreasonable to constitute a denial of a FAPE.  Accordingly, the Court grants A.G. and Ms. Glass's motion for summary judgment in part, and denies it in part, and does the same for the District's summary judgment motion.

### A.  The District's Seventeen Day Delay in Developing an Appropriate IEP for A.G.
### Constitutes a FAPE Denial

A.G. and her mother seek review of the hearing officer's conclusion that the District did not deny A.G. a FAPE due to its admitted seventeen-day delay in providing appropriate educational services for A.G. following her transfer to Wheatley EC while it developed her 2018 DCPS IEP.  Under § 300.323(f) of the IDEA regulations, which governs the transfer of IEPs for qualifying children who transfer schools from another state:

> If a child with a disability (who had an IEP that was in effect in a previous public agency in another State) transfers to a public agency in a new State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide the child with FAPE (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency—(1) Conducts an evaluation . . . (if determined to be

necessary by the new public agency; and (2) Develops, adopts, and implements a new IEP, if appropriate, that meets the applicable requirements. . .

34 C.F.R. § 300.323(f).

A.G., who has a disability and an accompanying IEP, transferred from Princeton Elementary in Maryland to Wheatley EC in the District fifteen days into the 2017-2018 school year. A.R. 7, 34. Having met the requirements of 34 C.F.R. § 300.323(f), she was entitled to the statute's protections. However, neither party disputes that during A.G.'s first seventeen-days at Wheatley EC she did not receive comparable services to her out-of-state 2018 Maryland IEP as required. Pl.'s MSJ at 11; Def.'s Reply Summ. J. ("Def.'s MSJ Reply") at 2, ECF No. 17. The hearing officer also recognized that "comparable services [to A.G.'s 2018 Maryland IEP] were not provided" to her during this time period, but concluded that the delay was justified. A.R. 26. The hearing officer's reasoning appears to have been based on his belief that the District was acting in good faith and that the over two-week delay was a de minimis violation, though his discussion of the issue is perfunctory at best. He first references A.G.'s special education team's "surprise[]" when they learned of the contradictory nature of her at the time current 2018 Maryland IEP and her old 2017 DCPS IEP, and notes that during the over two-week long period during which she received no comparable services, her team was taking "appropriate steps to determine how best to proceed with the 2 IEPs from 2017/18." A.R. 26. He also emphasized that the District "moved directly to a new IEP [for A.G.] in just a couple of weeks." A.R. 26. He closed his rationale by noting that even if a violation of the IDEA occurred, it at was at most a procedural violation. A.R. 27. His analysis ended there.

A.G. and her mother now challenge the hearing officer's determination, arguing that he "provided no legal rationale for this decision." Pl.'s MSJ at 11. In response, the District claims that the Hearing Officer's decision rested on his finding that the delay was at most a procedural

violation, and maintain that even if the delay constituted a procedural violation, it did not impact

A.G.'s substantive rights as required to constitute a denial of a FAPE.  Def.'s MSJ at 12–13.  In

reply, Ms. Glass posits that the two-week delay in implementing comparable services for A.G. is

a substantive, not procedural violation of the IDEA, but also argues that even if categorized as a

procedural violation, the delay still violated A.G.'s substantive rights.  Pl.'s Reply Summ. J.

("Pl.'s MSJ Reply") at 3, ECF No. 15.  The Court will first examine if the delay constitutes a

procedural or substantive violation of the IDEA, and then determine if the delay was such that it

constituted a denial of A.G.'s substantive right to a FAPE.

> 1.  The District's Over Two-Week Delay in Complying with the Out-of-State IEP Transfer
> Requirement was a Procedural Violation of the IDEA

The hearing officer concluded, and the parties do not dispute, that A.G. was not

provided comparable services to her 2018 Maryland IEP for the first seventeen days following

her transfer to Wheatley EC until her new 2018 DCPS IEP was implemented.  A.R. 26; Pl.'s

MSJ at 11; Def.'s MSJ at 10 (admitting "services were not provided to A.G. on the first day that

she began attending Wheatley EC.").  This is a plain violation of 34 C.F.R. § 300.323(f).  There

is, however, disagreement as to whether this delay constitutes a procedural or substantive

violation of the IEP out-of-state transfer requirement.  While neither of the parties nor this Court

were able to identify a case that has examined this exact issue, there is a general consensus that a

failure to comply with the timeliness requirements imposed by the IDEA are typically

procedural, not substantive, violations of the Act.  *See Leggett v. District of Columbia,* 793 F.3d

59, 67 (D.C. Cir. 2015) (classifying "a school district's failure to provide an IEP by the

beginning of the school year" as a procedural violation); *Shaw v. District of Columbia*, 238 F.

Supp. 2d 127, 135 (D.D.C. 2002) (same, noting "[i]t is clear" such delay is a procedural defect);

*see also Jackson-Johnson v. District of Columbia*, No. 13-CV-528, 2015 WL 1862127, at *1

(D.D.C. Apr. 23, 2015) ("[D]elays in evaluations and reevaluations are typically deemed

procedural, and not substantive, violations of the IDEA.").

Indeed, the facts in *Leggett* are almost precisely on point, though they concern a violation

of a different IDEA regulation.  Pursuant to 20 U.S.C. § 1414(d)(2)(A), schools are required to

have an IEP in place for each student with a disability "[a]t the beginning of each school year."

20 U.S.C. § 1414(d)(2)(A).  In *Leggett*, DCPS failed to meet this requirement, producing the IEP

after a delay of either two weeks or a month (the uncertainty being due to a dispute between the

parties regarding when the IEP was finalized).  *See Leggett*, 793 F.3d at 67.   Like A.G. and her

mother in the instant case, the aggrieved student in *Leggett* argued that this failure to develop an

IEP before the start of the school year "was, by itself, a denial of FAPE," not a procedural

violation.  *Id.*  The D.C. Circuit disagreed, determining that the failure to have an IEP on the

books at the beginning of the school year was a "procedural violation," and continued on to

analyze the violation under the corresponding framework for determining if the procedural

violation impacted the student's substantive rights such that it constituted a FAPE denial.  *Id.*

While the underlying regulations differ, the factual outcome in both cases is the same—just as

the student in *Leggett* had to wait two weeks for her IEP in violation of the IDEA's regulatory

requirements, so too did A.G. following her transfer to Wheatley EC.  Accordingly, this Court

will analyze the District's admitted violation of 34 C.F.R. § 300.323(f) under the standard

governing procedural violations.[5]

_____

[5] As previously noted, A.G. and her mother argue that the failure to provide comparable
services to A.G.'s 2018 Maryland IEP was a "substantive, not procedural violation of the IDEA."
Pl.'s MSJ Reply at 3.  They support this argument by citing to the language of the governing
regulation, which states that "[t]he new public agency (in consultation with the parents) must
provide the child with FAPE (including services comparable to those described in the child's IEP

2.  The District's Procedural Violation Constitutes a FAPE Denial

The over two-week delay in implementing A.G.'s IEP when she began fourth grade at Wheatley EC is a procedural violation of the IDEA.  But "an IDEA claim is viable only if those procedural violations affected the student's substantive rights."  *Lesesne*, 447 F.3d at 834.  A substantive rights violation can be found when a preponderance of the evidence shows that the procedural failure, *inter alia*, "[i]mpeded the child's right to a FAPE."  34 C.F.R. § 300.513(a)(2) (i); *id.* § 1415(i)(2)(C)(iii).  In the context of a procedural delay, the plaintiff must show that "the student's education would have been different but for the procedural violation." *Leggett,* 793 F.3d at 68 (internal citations omitted).

During the roughly two-week period in question, A.G.'s education would have been different but for the delay in compliance with the IDEA regulations.  Under the statutory framework the District was required to put into effect one of two options on A.G.'s first day at Wheatley EC: they could either (1) implement services comparable to A.G.'s 2018 Maryland IEP, or (2) create and implement a new IEP.  *See* 34 C.F.R. § 300.323(f).  But instead they did nothing, leaving A.G. without *any* specialized educational accommodations for two weeks,

---

from the previous public agency)."  *Id.* (quoting 34 C.F.R. § 300.323(f)).  They claim that because a FAPE in this instance is defined to include comparable services to an out-of-state IEP, the lack of such services means A.G. suffered an outright FAPE denial.  *Id.*  However, A.G. and her mother do not dispute that under the same regulation, the comparable services requirement can be supplemented by the "develop[ment], adopt[ion], and the implement[ion] of a new IEP." 34 C.F.R. § 300.323(f)(2); *see also* Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46,540, 46,681 (Aug. 14, 2006) ("When a child transfers from another State . . . [the new public agency must] provide the child with FAPE, including services comparable to those in the IEP from the previous public agency, *until such time as the new public agency. . . adopts a new IEP.*") (emphasis added).   And this is what occurred two weeks into A.G.'s tenure at Wheatley EC. A.R. 26.  Accordingly, the District's actions are more properly characterized as a delay in compliance with 34 C.F.R. § 300.323(f)(2), which, as detailed above, is properly analyzed as a procedural, not substantive, violation of the IDEA.

despite her known disabilities.  If either option was implemented immediately—as IDEA

required— A.G.'s education would certainly have been different and better tailored to her

learning needs.[6]  As a result, this delay was a violation of A.G.'s substantive rights.

Similar procedural failures have also been determined to be substantive violations of the

IDEA.  Returning again to *Leggett*, the D.C. Circuit ultimately held that the (at most) month-long

delay by DCPS in providing a student with an IEP at the start of the school year "was quite

clearly substantive," because during the interim period she did not "receive [] the targeted special

education she needed," thus denying her a FAPE.  *Leggett*, 793 F.3d at 68; *see also D.R. ex rel.*

*Robinson v. Gov't of Dist. of Columbia*, 637 F. Supp. 2d 11, 18–19 (D.D.C. 2009) (delay in

reconsidering plaintiff's IEP resulted in a violation of his substantive rights because if the IEP

had been considered in a timely manner, the plaintiff would have enjoyed the benefits of the

revised IEP during the period of delay).  Similarly, the District's delay in complying with the

IDEA's out-of-state transfer requirements was a violation of A.G.'s substantive rights and denied

her a FAPE.

The District's arguments to the contrary are without merit.  First, the District argues that

the admitted violation "does not rise to the level of a denial of a FAPE because the District

developed an appropriate IEP for A.G. approximately two weeks" after she began classes.  Def.'s

MSJ at 10.  The hearing officer similarly concluded the delay was excusable because "[the

District] moved directly to a new IEP in just a couple of weeks."  A.R. 26.  The Court cannot

---

[6] For example, A.G.'s 2018 Maryland IEP provided four hours per week of specialized instruction outside of general education and six hours within it, along with extended time for tests and modified assignments. A.R. 295–99, 307.  A.G.'s 2018 DCPS IEP that was implemented two weeks into A.G.'s tenure at Wheatley EC increased these supports.  A.R. 346, 355.  However, the record does not show that A.G. was afforded any of the specialized instruction to which she was entitled during her first seventeen days at Wheatley EC.

agree with this logic.  The fact that the District eventually complied with the law does not excuse the violation of the regulation, which mandates that during any interim period while a new IEP is being developed, a previous out-of-state IEP, such as A.G.'s 2018 Maryland IEP, must remain in effect.  *See* 34 C.F.R. § 300.323(f) ("[The District] *must* provide the child with FAPE (including services comparable to those described in the child's IEP from the previous public agency), *until* the new public agency. . .  implements a new IEP.") (emphasis added).  To the extent the District is arguing that the time period in question is so negligible as to constitute a *de minimis* statutory violation, this position finds no support in the caselaw.  As previously discussed, the D.C. Circuit found a similar two-week to one-month period in which a student was left without an IEP to be a substantive violation of the student's rights under the IDEA.  *See Leggett*, 793 F.3d at 67–68.

The District also argues that to require compliance with the comparable services requirement here "ignores the unique circumstances of this case."  Def.'s MSJ Reply at 2.  These "unique circumstances" appear to be that A.G.'s operative 2018 Maryland IEP was "vast[ly] differen[t]" from A.G.'s 2017 DCPS IEP from her time at another elementary school in the District.  *Id.* at 2–3.  This prompted DCPS to "thoroughly review [] A.G.'s educational records to be certain that comparable services were appropriate."  *Id.* at 3.  While the Court finds no fault with the further investigation conducted by A.G.'s multidisciplinary team and their interest in updating A.G.'s IEP to provide the best services to fit her needs, this does not excuse their failure to provide her *any* educational support in the meantime.  Indeed, the "unique circumstances" cited by the District only further emphasize that they were well aware of A.G.'s disabilities and need for classroom modifications for her to be able to access her education, given that they had her past two IEPs at their disposal.  If the District had fulfilled their statutory obligations on time, A.G. would have received an education at least partially targeted to her learning needs.  So even

if the Wheatley EC multidisciplinary team thought they could improve on A.G.'s 2018 Maryland IEP, that is no reason to deny A.G. any specialized education at all during the seventeen-day period in question.

Next, the District says that under the IDEA, "the educational services provided to a student" need only be "appropriate" and "reasonably calculated to enable a child to make appropriate progress in light of the child's circumstances."  Def.'s MSJ Reply at 2 (quotations omitted).  If this is in reference to the "appropriateness" of A.G.'s 2018 DCPS IEP that was finalized over two weeks after A.G. began attending Wheatley EC, it misses the point entirely. The fact that the 2018 DCPS IEP eventually developed was appropriate has no bearing on if A.G. was receiving an appropriate education during the period prior to when it was finalized. And again, the Court fails to see how A.G. could be receiving an "appropriate" education when she was not receiving any specialized accommodations at all despite having well-documented and well-known disabilities.

Finally, the District contends that the IDEA prioritizes first that "the student should receive an appropriate public education, and second, that the student should receive services that are comparable" to an out-of-state IEP.  Def.'s MSJ Reply at 2.  Even if the Court were to credit this strained reading of the statute in question, as previously discussed, an education cannot be appropriate when a disabled student's documented learning needs are entirely ignored and no specialized education is provided at all.  While the District may have taken appropriate steps to update A.G.'s IEP, they ignored their statutory obligation to ensure she received comparable services during the interim period, a decision that cannot be excused through oblique references to "appropriateness."

For all of these reasons, the hearing officer erred when he found that the District's failure to provide A.G. with either a new IEP or comparable services to her 2018 Maryland IEP during her first seventeen days at Wheatley EC was only a procedural violation that did not violate her substantive rights.  Given that the administrative determination failed to analyze under the governing legal framework whether this procedural violation rose to the level of a FAPE denial, it lacks the "reasoned and specific findings" that would allow the Court to uphold the decision. *See Kerkam*, 931 F.2d at 87.  Accordingly, the Court agrees with A.G. and Ms. Glass that the preponderance of the evidence available shows that the failure to provide services for the seventeen-day period in September 2018 denied A.G. a FAPE.

**B.  The Hearing Officer Correctly Denied A.G. and Ms. Glass's Claim Relating to the Appropriateness of A.G.'s 2018 DCPS IEP Classification**

A.G. and Ms. Glass also seek review of the hearing officer's determination that A.G.'s 2018 DCPS IEP disability classification was reasonable, claiming that it was inappropriate due to her disability classification change from ASD to ED.  Pl.'s MSJ at 16–17.  The District disagrees, arguing that A.G.'s disability classification as ED was proper.  Def.'s MSJ at 13.  Both parties claim that the record evidence supports their preferred disability diagnosis.  *See* Def.'s MSJ at 13; Pl.'s MSJ at 17.

The Supreme Court has stated that to be appropriate and constitute a FAPE, a student's IEP must form the basis for an educational program that is 'reasonably calculated to enable the child to receive educational benefits."  *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 995–96 (2017) (citing *Rowley*, 458 U.S. at 207).  When determining if a given IEP is appropriate, a court must undertake a "fact-intensive" inquiry into the "unique circumstances of the child for whom it was created," that ultimately asks not if the IEP is *ideal*,

but rather if it is *reasonable.  Id.* at 999, 1001 (internal quotations omitted).  This reasonableness standard incorporates deference to school officials due to their subject matter expertise and judgment, though the court still "may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his [or her] circumstances." *Id.* at 1002.

Accordingly, this Court has undertaken the task of evaluating if A.G.'s 2018 DCPS IEP—and more specifically, if the change in her disability classification—was reasonably designed in light of all of the circumstances to allow A.G. to make educational progress.  A.G.'s mother argues that the hearing officer's determination that the 2018 DCPS IEP was reasonable was made in error.  She claims that testimony from her witnesses was ignored and not properly credited, that select expert testimony from the District should have been invalidated, that evidence from A.G.'s psychological evaluations was not considered, and that the hearing officer improperly characterized some of A.G.'s symptoms and didn't take into account teacher accounts of A.G.'s behavior.  Pl.'s MSJ at 12–17; Pl.'s MSJ Reply at 4–8.  While the Court will address each of these claims in turn, having thoroughly reviewed the administrative record, the Court finds that A.G. and Ms. Glass have failed to meet their burden of showing by a preponderance of evidence that A.G.'s 2018 DCPS IEP disability designation was not reasonable in light of all the circumstances.

### 1.  Witness Testimony

Ms. Glass first argues that the hearing officer failed to properly consider both her testimony, and that of her experts Dr. Doyle and Dr. Gaines, while accepting what she characterized as "hypothetical[]" testimony from the District's witnesses.  Pl.'s MSJ Reply at 4; *see also* Pl.'s MSJ at 12, 17.  Generally, "a District Court must accept the [hearing officer's]

credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Moradnejad v. District of Columbia*, 177 F.Supp.3d 260, 281 (D.D.C. 2016) (quoting *J.N. v. District of Columbia,* 677 F. Supp. 2d 314, 322 (D.D.C. 2010)); *see also R.D. ex rel. Kareem v. District of Columbia*, 374 F. Supp. 2d 84, 89–90 (D.D.C. 2005) (noting that in cases such as here, where the record is not supplemented, "particular deference is due" to "the Hearing Officer's findings [that] are based on credibility determinations of live witness testimony."). Particularly in light of this deference, the Court finds the hearing officer's analysis and corresponding credibility determinations to be supported by the overall record, and not the source of any error in determining if A.G.'s 2018 DCPS IEP disability classification was reasonable. Moreover, the hearing officer relied on the entire body of evidence in the record— including medical evaluations of A.G., teacher reports, and past IEPs—which together provide a more than sufficient basis for the administrative finding that A.G.'s disability classification was appropriate.

   a. *The Hearing Officer Did Not Ignore Testimony from the Experts for A.G. and Ms. Glass*

   The administrative hearing involved opposing expert witnesses: the experts put forth by the District testified that A.G.'s behavior indicates that she has ED, while the experts for Ms. Glass argued the opposite, stating that ASD is a more appropriate diagnosis. In evaluating the testimony from these experts, the hearing officer determined that while A.G. and Ms. Glass's expert Dr. Doyle "is a very experienced Autism expert" he "never talked to or assessed [A.G.] or talked to or met [Ms. Glass]," and instead "rel[ied] on reports of interviews" to conclude that "ASD could not be ruled in or out" for A.G. A.R. 21; *see also* Doyle Tr. at A.R. 1201–02. On the other hand, the hearing officer found that the District's expert Mr. Deely "credibly testified" and "had a great deal of experience with [A.G.] as an evaluator and team member, as well as

informally observing [A.G.] around [Wheatley EC] in the halls and at recess, and was very knowledgeable of the record and issues at play."  A.R. 14, 21, 27.  Ms. Glass takes issue with this credibility determination—which is precisely the type of decision for which this Court must award the hearing officer deference, barring "non-testimonial, extrinsic evidence in the record [that] would justify a contrary conclusion." *Moradnejad*, 177 F.Supp.3d at 281.  But there is nothing like that in the record here.  The hearing officer's decision to afford more weight to testimony from an expert who had frequent and ongoing interactions with A.G. in the classroom environment over that of Ms. Glass's experts who either never met A.G. or did so only on a few occasions is a reasonable one, and nothing in the record disputes this conclusion.  Accordingly, the Court finds this argument without merit.

   *b. The Hearing Officer Did Not Improperly Ignore Testimony from Ms. Glass*

   Ms. Glass also takes issue with the fact that the District "elected not to provide a program of the type she said was appropriate," Pl.'s MSJ at 12, and ignored her testimony that in the past "A.G. thrived in an autism program but did not in a program for students with [ED]."  Pl.'s MSJ Reply at 4.  But while the IDEA does require that parental input be included in the IEP process, it does not mandate that parental desires should be allowed to overrule the recommendations of education professionals. *See Z. B. v. District of Columbia*, 888 F.3d 515, 523 (D.C. Cir. 2018) ("The Act welcomes parental input, but specifically charges the evaluation of the student and the framing of an adequate IEP to the school.").  This Court's review of the record does not demonstrate any extrinsic evidence indicating a need to set aside the hearing officer's assessment of the testimony provided by Ms. Glass.

   First, in regards to the substance of Ms. Glass's claim that A.G. performed better when placed in an ASD classroom compared to her tenure in a BES-type classroom, this disparity may

have been due to accommodations A.G. was still scheduled to receive under her 2018 DCPS IEP and BES classroom placement.  Ms. Glass testified that under A.G.'s 2018 Maryland IEP, A.G. "did excellent" and "phone calls decreased," which Ms. Glass hypothesized was due to accommodations such as one-on-one rewards, being allowed to have her backpack, breaks, earphones, and A.G.'s desk placement in the front of the class.  Glass Tr. at A.R. 1344.  But A.G. was to receive these same accommodations under her 2018 DCPS IEP, even with the disability classification change from ASD to ED.  *See, e.g.,* A.R. 358, 365.  It follows that this could have formed a valid basis for the hearing officer to not have followed Ms. Glass's placement recommendation.

Turning to the hearing officer's determination of the credibility of Ms. Glass's testimony, he concluded in his findings of fact that the record was "full of inconsistencies where [Ms. Glass] was reported to have said one thing earlier and another thing later about her situation . . . and about other facts in the case."  A.R. 21.  One such inconsistency is the source of Ms. Glass's objection to A.G.'s classification as ED and placement in a BES program.  Numerous special education professionals from Wheatley EC testified that during the September 27, 2018 meeting, they, along with Ms. Glass, reviewed both the ASD and ED classification criteria, and together they "agreed that [A.G.] fell most likely with her behaviors under the ED classification." Johnson Tr. at A.R. 1399-1401; *see also* Brainard Tr. at A.R. 1659, 1669.  There is no evidence in the record to indicate that Ms. Glass raised any concerns at this time about A.G.'s placement in a BES program, despite her current objections purportedly based on A.G.'s past poor performance in a similar program.  There is also some evidence to indicate that Ms. Glass only objected to the BES program after she learned it would require A.G.'s transfer to another school. *See, e.g.,* Deely Tr. at A.R. 1454 (noting "[Ms. Glass] became upset at the end of the meeting"

when she realized Wheatley EC did not provide an onsite BES program.); Brainard Tr. at A.R. 1669 (testifying that "when mom was made aware that [A.G.] would be moved, mom became incredibly angry"). In light of this and the numerous other inconsistencies in the record with regard to Ms. Glass's testimony, *see infra* Section IV.B.2.a, this Court finds the hearing officer's credibility determination as to Ms. Glass's testimony to be without error.

   c.   *The Hearing Officer Did Not Err in Determining Mr. Deely's Testimony was Credible*

      In addition to arguing that her witnesses' testimony should have been awarded more weight, Ms. Glass finds fault with the hearing officer's acceptance of testimony from Mr. Deely, the school psychologist at Wheatley EC and expert witness for the District. She posits that the hearing officer erred by "rel[ying] on the opinion of an expert . . . who admitted to having conducted the relevant testing for autism incorrectly." Pl.'s MSJ at 17. The Court disagrees, and finds the hearing officer's actions appropriate.

      The hearing officer found that Mr. Deely "convincingly" and "credibly testified" and "had a great deal of experience with [A.G.] as an evaluator and team member, as well as informally observing Student around [Wheatley EC] in the halls and at recess, and was very knowledge of the record and issues at play." A.R. 14, 21, 27. As previously stated, Ms. Glass disagrees. She points to his error in administering the CARS-2 evaluation to her as a basis to invalidate his testimony. Pl.'s MSJ at 17. This course of action is disproportionate to the type of error that occurred.

      The CARS-2 evaluation in question was initially administered to Ms. Glass and A.G.'s special education teacher. A.R. 14. There is no dispute that the evaluation in question "shouldn't have been given" to Ms. Glass, as Mr. Deely himself testified. Deely Tr. at A.R. 1511. As he explained, the "CARS 2 rating scales are meant to be filled out by specifically

people [sic] who are familiar with [ASD] and are experts with the disorder" but he confused the

test with other assessments and "made a mistake giving it to" Ms. Glass, who lacked the required

expertise.  Deely Tr. at A.R. 1457.  The Court finds that this error would be an improper basis to

invalidate Mr. Deely's testimony, particularly given that A.G.'s medical record notes that Ms.

Glass had completed the CARS-2 in the past, Deely Tr. at A.R. 1457, indicating that this mistake

is not uncommon, and that Mr. Deely may have made the somewhat reasonable assumption that

Ms. Glass was qualified given her past experience with the test.  And contrary to Ms. Glass's

assertions, *see* Pl.'s MSJ at 17, the hearing officer did not credit the improperly-administered

test.  He specifically noted the error by Mr. Deely in administering the test to Ms. Glass, and

"disregarded" Ms. Glass's CARS-2 ratings.  A.R. 14.  So while his opinion stated that "[Mr.

Deely] conducted a CARS-2 . . . and concluded (based on 1 rater) that [A.G.] displayed minimal

to no symptoms of ASD," A.R. 14, the one rater referenced is not Ms. Glass, but rather A.G.'s

special education teacher who also completed the CARS-2.  This teacher was appropriately

qualified to complete the evaluation given that she had been a special education teacher for

roughly "five years" and during this time "work[ed] with students that have [ASD] every day."

Deely Tr. at A.R. 1479.  Her CARS-2 evaluation of A.G. concluded that across the fourteen

categories of evaluation, "there [were] minimal to no symptoms of ASD present." Deely Tr. at

A.R. 1510.

Ms. Glass also asserts that the hearing officer improperly credited Mr. Deely's testimony

that "A.G. did not have communication or social impairments" despite this statement being

"significantly undercut by the documentary evidence."  Pl.'s MSJ at 17.  The documentary

evidence Ms. Glass argues supports her assertion is that during cross-examination Mr. Deely

"acknowledged that A.G. struggled to maintain friendships with peers, that a relationship with

[an]other peer is possible for students with autism, and that descriptions of A.G.'s poor eye

contact, lack of awareness of surroundings, and difficulty getting her attention were all consistent

with autism." *Id.* (citing Deely Tr. at A.R. 1483–84). While Mr. Deely did acknowledge that

these behaviors can be consistent with ASD, he also provided a multitude of examples of A.G.'s

social and communication skills that are not consistent with ASD. For example, he described

how "[A.G.] is socially aware of other students and teachers" and can "change her behavior

gauged upon whether she's being monitored by others" indicating a degree of social awareness

not present in those with ASD. Deely Tr. at A.R. 1459. He also described A.G.'s social

interactions with her peers by describing her behavior at recess; including her ability to "tak[e]

on . . . a leadership role" with other students and even "manipulate them to go do certain things

they know they're not supposed to do." Deely Tr. at A.R. 1493–94. In terms of language and

communication, Mr. Deely also described how A.G. understands sarcasm and non-tangible uses

of language (*e.g.*, the expression, "walking slow like molasses"), which he explained are

concepts that are "extraordinary difficult for [those with ASD] to comprehend" with even high-

functioning ASD high schoolers requiring individualized training on these concepts. Deely Tr.

at A.R. 1461. A.G., however, understood sarcasm as young as kindergarten. Deely Tr. at A.R.

1461. Given that these observations were also supported by additional evidence in the record,

this Court finds the hearing officer's conclusion regarding Mr. Deely's testimony to not be in

error.[7]

---

[7] Furthermore, even if the hearing officer made an incorrect credibility determination, where "the credibility finding was not crucial to the outcome . . . it does not provide a basis for overturning the hearing officer's decision on the merits." *A.M. v. District of Columbia*, 933 F. Supp. 2d 193, 203 (D.D.C. 2013). While this Court does not believe the credibility determination as to Mr. Deely to have been made in error, the record contains enough information between A.G.'s medical records, past IEPs, teacher reports, and other witness

## 2.  Evidence from A.G.'s Psychological Evaluations

Ms. Glass next argues that the hearing officer improperly focused on the "informal observations of teachers and other staff members" and "failed to accurately consider" the February 2019 independent psychological evaluation and 2014 psychological evaluation that she claims show definitively that A.G. was diagnosed with ASD.  Pl.'s MSJ Reply at 5–6.  However, a review of the evidence shows that these evaluations were far from definitive, and the Court believes that the hearing officer properly weighed this evidence in reaching his determination that A.G.'s ED classification was proper.

### a.  2019 Independent Psychological Evaluation

Ms. Glass claims that the hearing officer should have credited the results of the 2019 Independent Evaluation that diagnosed A.G. with ASD, arguing that instead he improperly relied "on the informal observations of teachers and other staff members, which are less likely to be accurate."  Pl.'s MSJ Reply at 5–6.  This conclusion ignores both the various issues identified with the 2019 Independent Evaluation and the proper role such an assessment should play in an IEP determination.  An independent evaluation does not trump all of the other data in a student's educational record, but acts as another piece of evidence to be evaluated by the fact-finder.  *See Z. B.*, 888 F.3d at 525 (noting that the "reviewing court must answer the predicate question whether—combined with all other relevant data—any assessment parents may have sought and funded on their own provided a materially accurate and adequate account of the student's circumstances.").  And the evidence here is that the 2019 Independent Evaluation has several flaws which the hearing officer determined—and this Court agrees—prevents it from providing a

---

testimony to uphold the hearing officer's determination that A.G.'s disability classification was reasonable, even without his testimony.

fully adequate and conclusive account of A.G.'s disability condition.  Accordingly, it does not deserve precedence over the other evidence in the record.

First and foremost, as Mr. Deely pointed out in his testimony and the hearing officer noted in his report, a "notable problem" with the 2019 Independent Evaluation is that while the report claims one of the bases for A.G.'s ASD diagnosis is her CARS scores from the administration by the independent evaluator, the actual scores were not included in the report. A.R. 14–15; Deely Tr. at A.R. 1497.  When questioned about this deficiency, Dr. Doyle said he was told by the independent evaluator that the scores were corroborated by A.G.'s medical history as relayed by Ms. Glass, though he admitted that he also had not seen the scores.  Doyle Tr. at A.R. 1213; A.R. 14–15.   The lack of actual scores is particularly troubling given that when Mr. Deely administered the CARS-2 assessment just a few months earlier to A.G.'s special education teacher, it found that A.G. displayed "minimal to no symptoms of ASD."  Deely Tr. at A.R. 1510.  Without the specific CARS score data from this second evaluation, the hearing officer and now this Court are left with limited options for reconciling this conflicting diagnosis information.

Further compounding the problem is, as the hearing officer pointed out, that A.G.'s "evaluations are full of inconsistencies" regarding Ms. Glass's parental reports of A.G.'s ASD symptoms, and "no school has ever received solid records that are not based on Parent reporting."  A.R. 21.  Ideally, the 2019 Independent Evaluation would have provided an assessment separate from these parental reports, but instead it "reli[ed] heavily on [Ms. Glass's] reports" of clinically significant ASD symptoms.[8]  A.R. 15.  It also relied on past evaluations of

---

[8] There is reason to question the veracity of Ms. Glass's parental report for A.G.'s 2019 Independent Assessment.  For example, when the District's expert witness Mr. Deely was asked at the administrative hearing about certain "classic autism" behaviors that had been reported by

A.G. that documented ASD symptoms or provided an ASD diagnosis—but these previous

assessments were also either based solely on parental reports or diagnoses for which Ms. Glass

has not provided documentary proof to verify.  A.R. 15.

Another potential shortcoming of the 2019 Independent Evaluation is that the author of

the report did not observe A.G. in an educational setting, a step Mr. Deely noted to be

"imperative" to conducting a comprehensive ASD evaluation.  Deely Tr. at A.R. 1499–1500.

And while the 2019 Independent Evaluation did reference teacher reports of potential ASD

behavior by A.G. such as "babbling or saying things that made no sense" and "seeming out of

touch with reality," the report also includes statements from these same teachers that could

instead support an ED diagnosis.  A.R. 15; *see also* A.R. 793 (describing how "teachers reported

that [A.G.] argues when she does not get her way, is overly aggressive, annoys others on

purpose, defies teachers, teases other students, and attempts to get even when she believes others

have mistreated her").  In sum, the record provides plenty of reasons for the hearing officer to

have questioned the reliability of the 2019 Independent Evaluation, which is far from the

panacea to A.G.'s classification uncertainty that Ms. Glass wishes it to be.

### b.  2014 Psychological Report

Ms. Glass also argues that the 2014 ASRS evaluation administered to A.G.

"demonstrated elevated scores [for A.G.] in fourteen out of twenty Autism Rating Scale

---

Ms. Glass to the independent evaluator and were cited in the 2019 Independent Evaluation
diagnosis, such as hand flapping, Mr. Deely noted that "[i]t's a new thing that's been brought
up" and not based in the record.  Deely Tr. at A.R. 1504.  He also testified that, contrary to what
was reported to the independent evaluator, he was told by Ms. Glass that A.G. met her
developmental milestones on time which is a "pivotal" consideration when making an ASD
diagnosis.  Deely Tr. at A.R. 1498; *see also* A.R. 14 ("School Psychologist interviewed [Ms.
Glass], who stated that [A.G.] met all development milestones within normal limits including
crawling, walking, speaking, and toilet training.").

categories," indicating an ASD diagnosis.  Pl.'s MSJ Reply at 5–6.  But contrary to Ms. Glass's

claims, the 2014 evaluation did not provide a clear diagnosis of ASD.  Indeed, the report

specifically declined to apply an ASD diagnosis.  A.R. 60.  And while A.G. was found to have

"slightly elevated" and "highly elevated" ASD indicators based on parental and teacher

evaluations respectively, the report ultimately concluded that these indicators were likely due to

A.G.'s "many oppositional and noncompliant behaviors" that "may have resulted in some

elevated scores on the ASRS rating scale."  A.R. 60.  The report also details several ways in

which A.G. "demonstrated many skills atypical of students with Autism."[9]  A.R. 60.  Tellingly,

A.G.'s school system at the time declined to classify her as a student with ASD based on the

results of this evaluation.  A.R. 60.

### c. The Hearing Officer's Characterization of A.G.'s Medical Record

Ms. Glass also takes issue with the hearing officer's conclusion that "there was no

independent medical diagnosis of autism that was not simply based on [Ms. Glass's] report,"

calling out this statement as "incorrect" and indicative of the hearing officer's erroneous overall

determination.  Pl.'s MSJ at 16 (quoting A.R. 27).   Specifically, Ms. Glass disputes this

characterization in reference to the 2019 Independent Evaluation (seemingly conceding that the

other instances in which A.G. was diagnosed with ASD were indeed based on parental report).

*Id.*  She claims that the 2019 Independent Evaluation relied on four separate factual bases for

A.G.'s diagnosis, only one of which was parental report.  These include: (1) parental report of

A.G.'s developmental history, (2) CARS results, (3) personal observations by the evaluator, and

---

[9] Mr. Deely, the school psychologist at Wheatley EC who observed and evaluated A.G. during the 2018-2019 school year, testified that A.G. continues to display these same behaviors that are atypical of an ASD student, such as imaginative play, that were noted in the 2014 Psychological Assessment.  A.R. 1467.

(4) teacher reports.  *Id.*  While the hearing officer's language could have been more precise, the Court ultimately finds that this critique is largely without merit.

First, Ms. Glass takes the claim in question somewhat out of context: the full sentence from the administrative finding reads, "[a]s School Psychologist convincingly testified, there was no independent medical diagnosis of Autism that was not simply based on Parent report."  A.R. 27.  While there is no citation provided for this statement, there are two relevant statements made by Mr. Deely to which this could be referring.  First, he testified that "every time it says [A.G.] has autism, every time it was based upon mother's report and there was never any hard black and white evidence, medical diagnosis of autism, *given to any school-based report*."  Deely Tr. at A.R. 1507 (emphasis added).  Here Mr. Deely is not referencing the 2019 Independent Evaluation, given that it was (by design) not a school-based report.  Next, Mr. Deely testified that "there were no standardized assessments administered and data was collected entirely through the parent report" and "the classification was made by a licensed social worker, which isn't very typical."  Deely Tr. at A.R. 1464.  The record is somewhat unclear as to what report Mr. Deely is referencing—first he discusses the March 2018 Psychological Report, and then he references the 2019 Independent Evaluation (though both were referred to their exhibit numbers and not report name at the hearing).  *See* Deely Tr. at A.R. 1463–64.  But based on the actual context of his comment, he must be discussing the November 2013 evaluation, which is the only assessment in which A.G. was diagnosed by a social worker with ASD, and no standardized assessments were administered.  *See* A.R. 270 (November 2013 evaluation recounted in March 2018 Psychological Report).  On both occasions Mr. Deely did not appear to reference the 2019 Independent Evaluation, making the statement in question by the hearing officer broader than the underlying record warranted.

However, on this Court's review, this conclusion, even if encompassing the 2019 Independent Evaluation as well, is generally supported by the factual record.  While the hearing administrator's wording was not the most artful, the record reveals that the 2019 Independent Evaluation was indeed *primarily* based on Ms. Glass's personal observations of A.G. and past evaluations that were in turn also primarily based on her parental reports of A.G.'s ASD behaviors.  Illustrating this point, the 2019 Independent Evaluation is filled with references to parental reports:  "Ms. Glass stated that she thinks A.G.'s behavior is characteristic of a child with Autism Spectrum Disorder," A.R. 787, "Ms. Glass stated that doctors first indicated observing clinically significant symptoms of ASD when A.G. was two or three years old," A.R. 787, "[s]ince then she was reportedly diagnosed with Autism at Shepherd Pratt,[10]" A.R. 787, "Ms. Glass . . . believes [A.G.'s behavior problems] are related to autism" A.R. 787,  A.G. "reportedly began presenting with symptoms of Autism Spectrum Disorder around age two or three.  Ms. Glass stated that A.G. would bang her head against things, frequently flip her hands back and forth[] and cover her ears," A.R. 793.  Dr. Doyle also testified that he was told by the evaluator that "a lot of [the indications for ASD he found were] based on the history that [Ms. Glass] gave him."  Doyle Tr. at A.R. 1213.  And recall the prior discussion at *supra* Section IV.B.2.a, discussing the various issues with the 2019 Independent Evaluation, all of which undermined the non- parental report sources of data for A.G.'s ASD diagnosis.  In short, the CARS data was not included in the report itself, and the teacher reports contained examples of behavior that could support either an ED or ASD classification.  Given these shortcomings, the Court does not find that this small error by the hearing officer would have impacted his overall

---

[10] Ms. Glass admitted under cross examination that while she had committed to providing proof to A.G.'s interdisciplinary team of A.G.'s past ASD diagnosis, she never provided that information because she was "having problems with the doctor's office."  Glass Tr. at A.R. 1364.

conclusion such that it shows by a preponderance of the evidence that A.G.'s classification was incorrect.

### 3.   Other Alleged Mistakes by the Administrative Officer

Ms. Glass also alleges a couple of other errors she claims were made by the administrative officer that improperly influenced his determination of the appropriateness of A.G.'s disability classification.  Namely, she claims that he improperly characterized A.G.'s eye contact issue and ignored reports from A.G.'s teachers detailing ASD symptoms.  Pl.'s MSJ at 16; Pl.'s MSJ Reply at 6.  The Court finds these claims to be unsupported by the record.

#### a.   A.G.'s Ability to Maintain Eye Contact

The record shows that the issue of A.G.'s eye contact is one of much dispute, as poor eye contact can be indicative of ASD.  A.R. 19.  Ms. Glass finds fault with the hearing officer's determination that "[A.G.'s] eye contact [is] good," because he relied on a 2013 evaluation, when, she argues, more recent evaluations conducted by Dr. Doyle and Dr. Gaines reported A.G. had poor eye contact.  Pl.'s MSJ at 16 (citing A.R. 23, 793; Gaines Tr. at A.R. 1228).   But during the hearing Ms. Glass herself testified that "[A.G.'s] eye contact is pretty good," Glass Tr. at A.R. 1340, and other recent observations of A.G. by Wheatley EC school officials also support this characterization.  *See, e.g.,* McClary Tr. at A.R. 1523 (testifying that "[A.G.] is an in-your-face person" and contrasting A.G.'s behavior with autistic students who have a hard time with direct eye contact, describing how A.G. "will look you in your face to get a point across."); Deely Tr. at A.R. 1494  (testifying that A.G. "like[s] to say hello to [him]" and will greet him in the school hallways, which he characterized as "atypical of any student," but particularly one with ASD).  Given this additional support in the record for the hearing officer's conclusion, Ms.

Glass cannot carry her burden of showing by a preponderance of evidence that his determination was incorrect.

### b. A.G.'s Teacher Evaluations

As previously discussed, A.G.'s teacher evaluations provide examples of A.G.'s behavior that both parties use to support their own diagnosis theories. While Ms. Glass claims that because "A.G.'s teachers reported as part of the 2019 evaluation that A.G. had difficulty with establishing peer relationships, babbled to herself, and sometimes said things that made no sense," the hearing officer was incorrect to conclude that A.G. has social skills such that she does not suffer primarily from ASD. Pl.'s MSJ Reply at 6 (citing A.R. at 794). But these same teacher evaluations also noted that A.G. displayed classic ED symptoms, including "argu[ing] when she does not get her way, [being] overly aggressive, annoy[ing] others on purpose, def[ying] teachers, teas[ing] other students, and attempt[ing] to get even when she believes others have mistreated her." A.R. 793. And as discussed at length, the record also contains numerous examples of A.G. displaying social and communications skills that are atypical in those diagnosed with ASD. Given the lack of clarity in the record, Ms. Glass cannot show by a preponderance of the evidence that the hearing officer was wrong on this issue.

### C. Compensatory Education

Having concluded that a preponderance of the evidence shows that the District violated the IDEA and denied A.G. a FAPE by declining to provide A.G.'s required educational accommodations during her first seventeen days at Wheatley E.C., the Court now considers A.G. and Ms. Glass's request for relief. They ask for compensatory relief for A.G. on all of her claims. Pl.'s MSJ at 17–18. As previously discussed, compensatory education is an educational service to compensate students eligible for services under IDEA who, like A.G., have been

denied the individualized education to which they are entitled. *See Reid*, 401 F.3d at 518. Ms. Glass has provided the Court with a compensatory education proposal, requesting six months of ABA Therapy and/or social skills training, and six months of Independent Tutoring. *See* A.R. 1055. However, the Court finds this proposal inappropriate, given that it is based on Ms. Glass's allegations of several denials of FAPE, not all of which this Court has recognized.

In light of this, the Court concludes that remand to the hearing officer to determine the appropriate compensatory education for A.G. is the proper course of action. The D.C. Circuit has held that a district court may remand for the purposes of considering an award of compensatory education following a finding that a child was denied a FAPE. *See Reid*, 401 F.3d at 526; *see also Branham ex rel. Branham v. Gov't of Dist. of Columbia*, 427 F.3d 7, 13 (D.C. Cir. 2005) ("*Reid* permits the district court to . . . return the case to the hearing officer"). And district courts in this Circuit use remand to allow the hearing officer to make the compensatory education determination, particularly where the "hearing officer is better situated than [the] Court to take additional evidence, to make further factual findings, and to evaluate [the student's] current educational need in designing the appropriate relief." *Middleton*, 312 F. Supp. 3d at 153; *see also Wilson v. District of Columbia*, 770 F.Supp.2d 270, 277 (D.D.C. 2011). In the instant case, the hearing officer is better situated than this Court to conduct the required "fact-specific exercise of discretion," *Reid*, 401 F.3d at 518, and create the appropriate award, if he finds an award to be required, that takes into account both the relatively brief duration of A.G.'s FAPE denial and A.G.'s current educational needs.[11] Accordingly, the Court remands this case to the

---

[11] The Court recognizes that it is within the hearing officer's discretion to conclude that no award of compensatory education is required in this case. "Even if entitlement to an award is shown through a denial of a free and public education, it may be conceivable that no compensatory education is required for the denial of a FAPE either because it would not help or because the student has flourished in [their] current placement." *Phillips ex rel. T.P. v. D.C.*, 932

hearing officer to fashion a modest award, if any, that "aim[s] to place [A.G.] in the same

position [she] would have occupied but for the school district's violations of IDEA," *id.* at 518,

*i.e.*, an award that places A.G. in the same place she would have occupied if she had received

seventeen days of services comparable to those described in the 2018 Maryland IEP (four hours

per week of specialized instruction outside a general education classroom, four hours per week

of specialized instruction inside a general education classroom, no counseling or BSS, and

additional classroom modifications). *Id.*

## V.  CONCLUSION

For the foregoing reasons, Ms. Glass and A.G.'s motion for summary judgment (ECF No.

11) is granted in part and denied in part.  The District's motion for summary judgment (ECF No.

13) is also granted in part and denied in part.  This case is remanded for further proceedings

consistent with this opinion and for a determination of the appropriate relief, if any is required.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  November 19, 2020                                    RUDOLPH CONTRERAS
                                                             United States District Judge

---

F. Supp. 2d 42, 50 (D.D.C. 2013) (collecting cases); *see also Banks ex rel. D.B. v. D.C.*, 720 F.
Supp. 2d 83, 91 (D.D.C. 2010) ("Upon a finding that the denied services constituted the denial of
a free appropriate public education, the hearing officer should evaluate whether there is sufficient
evidence to support a finding that no compensatory education is necessary to remedy the services
the School System did not provide").  Therefore, if the Hearing Officer finds that the
"deficiencies [A.G.] suffered already have been mitigated" then he can conclude that "no
compensatory education is required." *Phillips*, 932 F. Supp. 2d at 50.